# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-0138V

|  |  |
|---|---|
| THOMAS FIUMARA,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: October 30, 2024 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Joseph Leavitt, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On February 1, 2023, Thomas Fiumara filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") as the result of an influenza ("flu") vaccine administered to him on November 4, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Masters. For the reasons set forth below, I find that Petitioner is entitled to **$197,500.00 for past pain and suffering, as well as reimbursement of two Medicaid liens.**

## I. Relevant Procedural History

The case was assigned to SPU in May 2023. ECF No. 9. In September 2023, Respondent recommended, and I agreed, that Petitioner was entitled to compensation because he had satisfied the criteria set forth in the Vaccine Injury Table and the Qualifications and Aids to Interpretation ("QAI") for GBS following a seasonal flu vaccine. Rule 4(c) Report (ECF No. 20) and Ruling on Entitlement (ECF No. 21). After about six months of discussion, however, the parties hit an impasse on the appropriate pain and suffering award. All intended evidence, and briefing on that topic, has now been filed. Brief filed May 28, 2024 (ECF No. 33); Response filed July 25, 2024 (ECF No. 35); Reply filed Aug. 26, 2024 (ECF No. 36).[3] The matter is ripe for adjudication.

## II. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections II – III of *Holmberg v. Sec'y of Health & Hum. Servs.*, No. 21-1132V, 2024 WL 4607929 (Fed. Cl. Spec. Mstr. Oct. 7, 2024).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

---

[3] Petitioner also filed documentation of two Medicaid liens. *See* Exs. 17 – 18 (ECF No. 31 – Attachments 1 – 2); Status Reports (ECF Nos. 37 – 38). Respondent agrees to the reimbursement of both liens. Response at n. 1.

[4] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

### III.     The Parties' Arguments

The parties agree that Petitioner is entitled to reimbursement of two Medicaid liens associated with his GBS, in the total amount of $13,222.68. Ex. 17 at 2; Ex. 18 at 2; Response at n. 1; Reply at n. 1.[5] Thus, the only disputed issue is the appropriate pain and suffering award.

In seeking the full amount allowed under the Act ($250,000.00), Petitioner argues that he suffered a "rapid and severe onset of GBS, followed by an extensive course of treatment that has ultimately produced mixed results and continued suffering." Brief at 22. His initial experience included a seven-day hospitalization (featuring MRIs of his spine, a lumbar puncture, and three days of IVIg); 24-day inpatient rehabilitation; and several years of outpatient care (including several rounds of physical and occupational therapies; neurology and pain management appointments; further MRIs; prescription pain medications; and a nerve block). *See generally id.* at 3 – 17. Petitioner argues that his GBS alone (without reference to any comorbidities/ alternative explanations) has caused several years of persistent pain, fatigue, and balance limitations. As a result of these symptoms, he can no longer perform construction or carpentry work (his prior sources of income); house or yard work; recreational activities such as fishing, boating, and mountain biking; or sexual activities. Ex. 20. His life partner and son affirm and elaborate on these changes to his life and wellbeing. Exs. 21 – 22; *see also* Brief at 22 – 26.

Petitioner maintains that his pain and suffering exceeded what was established in the cases of *Johnson*, *Fedewa*, *McCray*, and *Kresl* (each awarding $180,000.00). Brief at 26 – 29.[6] His pain and suffering award should therefore be increased further to recognize that but for his GBS, he would have continued to work in construction for many years into the future. *Id.* at 29 – 30. Petitioner also argues that his requested amount is consistent with how Respondent has settled past cases, and consistent with the Vaccine Act's remedial purpose. *Id.* at 30 – 32.

In contrast, Respondent proposes just $131,500.00 – arguing that Petitioner's initial GBS clinical progression and treatment course was "moderate[ly]" severe, and his post-hospitalization records indicate "two significant gaps in treatment," which in Respondent's view, suggest "wax[ing] and wan[ing]" of symptoms. Response at 8 – 9.

---

[5] Petitioner's Brief at 1 and 32, inadvertently misstated the Medicaid lien amount total.

[6] *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018); *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 202 WL1915138 (Fed. Cl. Spec. Mstr. March 26, 2020); *McCray v. Sec'y of Health & Hum. Servs.*, No. 19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021); *Kresl v. Sec'y of Health & Hum. Servs.*, No. 22-0518V, 2024 WL 1931498 (Fed. Cl. Spec. Mstr. Apr. 1, 2024).

Respondent also suggests that Petitioner's long-term complaints are at least partially explained by preexisting and worsening lumbar spine degenerative disc disease. *Id.* at 10. Respondent argues that Petitioner's cited cases, as well as *Elenteny* (awarding $180,000.00) and *Enstrom* ($170,000.00) each established pain and suffering that was more severe, continuous, and directly related to GBS (rather than to any medical comorbidities). *Id.* at 9 – 13.[7]

Petitioner maintains that his initial course of treatment was intrusive and significant. Reply at 2 – 3. He disputes that any "gaps in treatment" are "indicative of anything more than a period of time between appointments, [or] have any relationship to petitioner's degree of pain." *Id.* at 3. There is no "finality" to his pain and suffering. *Id.* Petitioner also contends that Respondent has not cited specific medical records that support that his long-term picture is explained by "unrelated degenerative disc disease." *Id.* Instead: "the record is replete with evidence of Petitioner's poor balance and persistent weakness resulting from his GBS injury." *Id.* Petitioner argues that his experience was more severe than that established in *Elenteny and Enstrom*. Id. at 4 – 5.

## IV.  Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The parties agree, and my own review of the evidence confirms, that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

The medical records (supplemented by the affidavits) best support the conclusion that Mr. Fiumara's pain and suffering – both in the acute course following the November 2020 vaccination and onset of GBS, and for at least three years after - was severe.

Regarding the initial course, GBS onset is alarming for most individuals – and here, Petitioner experienced not only weakness, decreased reflexes, and sensory changes, but severe pain in his low back and legs. His two first encounters, at a local hospital's

---

[7] *Enstrom v. Sec'y of Health & Hum. Servs.*, No. 20-2020V, 2023 WL 345657 (Fed. Cl. Spec. Mstr. Dec. 16, 2022); *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498 (Fed. Cl. Spec. Mstr. Feb. 1, 2023).

4

emergency room on November 16 and 17, were inconclusive, and he was discharged with prescription medications for back pain and anxiety. Ex. 5 at 43 - 45, 63 – 64.

Petitioner's pain continued, and ascended to his chest and arms; he was unable to sleep; and he was unable to walk unassisted, falling numerous times. He also developed constipation, urinary retention, and dysphagia. On November 18, 2020, Petitioner's life partner called 911, and secured an ambulance transport[8] to Massachusetts General Hospital ("MGH" – a teaching hospital affiliated with Harvard University Medical School). Ex. 6 at 43, 63, 78 – 81, 92 – 95.

Once at MGH, Petitioner was promptly admitted and diagnosed with GBS (the AIDP variant). The hospitalization included neurological evaluations; MRIs of his cervical, lumbar, and thoracic spine (Ex. 6 at 89 – 90); a lumbar puncture (*id.* at 179 – 80); three doses of IVIg (*id.* at 119, 122, 130); continued prescription pain medications, including the start of gabapentin (*id.* at 95); initial evaluations by occupational therapy ("OT"), speech/ language therapy ("SLT"), and physical therapy ("PT") (*id.* at 95 – 107), a liquid diet (*id.* at 99 – 100); an "aggressive bowel regimen" to treat constipation (*id.* at 52); and a bladder ultrasound followed by at least two catheter draws to relieve urinary retention (*id.* at 151, 163). Due to suspected dysautonomic involvement, his respiration was checked regularly (but it fortunately remained stable). *See, e.g.*, *id.* at 129, 136 – 37, 159 – 60. At the conclusion of his seven-day inpatient hospitalization, on November 25, 2020, Petitioner had "slurred [but] clear" speech; decreased motor strength in all four extremities; diffusely decreased sensation to touch, to about T3; and continued neurological pain. Ex. 6 at 48 – 58 (MGH discharge summary); *see also id.* at 163 – 67 (last MGH inpatient neurological progress note).[9]

For the next 24 days (November 25 – December 19, 2020), Petitioner remained at an inpatient rehabilitation facility. *See generally* Ex. 3. By discharge, his swallowing, bowel, and bladder were improved. And despite making "adequate" progress, he had weakness in both legs and gait abnormalities. He was using a walker to ambulate. Ex. 3 at 132 – 38.

Petitioner was initially homebound due to his GBS residual effects, as well as his at-risk status for COVID-19 infection. *See* Ex. 6 at 28 – 31 (MGH neurology outpatient initial evaluation, conducted via telehealth); Ex. 4 at 88 (home health record). He received

---

[8] Petitioner has not filed any emergency medical services ("EMS") records.

[9] During the MGH inpatient hospitalization, an EMG was initially considered, then cancelled. Ex. 6 at 299 (stating that "inpatient EMGs should be requested for urgent or emergency indications only"). The MGH discharge summary recommended "consider[ation of] EMG given atypical presentation." *Id.* at 50. However, an EMG was not obtained at any time thereafter.

5

six in-home PT sessions between January 6 – 26, 2021. Ex. 4 at 116 – 167.[10] The in-home PT discharge summary states that Petitioner had somewhat improved pain levels (ranging from 3 – 6/10) and improved endurance; he was "modified independent" at home, with his life partner's presence "24/7." *Id.* at 167. He could ride a stationary bike for 10 minutes and could walk to a neighborhood store with a cane. *Id.* However, because his progress had "plateaued," he was discharged from formal PT to continue exercises on his own, focused on "core strengthening and endurance." *Id.* Also in January 2021, he began complaining of daily headaches rating up to 7/10. *See, e.g.*, Ex. 4 at 83. He then attended 9 outpatient PT sessions from May 12 – June 25, 2021. Ex. 7 at 80 – 85; Ex. 10 at 33 – 59.

With respect to Petitioner's longer-term course, Respondent contends that two "significant gaps in [GBS] treatment… suggest that the severity of Petitioner's pain and suffering waxed and waned throughout his course of treatment." Response at 8 – 9. The first GBS treatment gap ran from his June 2021 PT end (Ex. 10 at 33 – 34) to his January 2022 neurology reevaluation (Ex. 9 at 13 – 18). But MGH neurology had encouraged his return earlier, in September 2021 (Ex. 9 at 36 – 37, 39 – 40). The gap was likely due to Medicaid coverage issues. *See* Ex. 9 at 13; Ex. 11 at 304 (explanation in later medical records); Exs. 17, 18 (Medicaid lien statements); Ex. 20 at ¶ 4 (Petitioner's affidavit, stating that his "government insurance will only cover so many visits and services"). Additionally in January 2022, MGH neurology did not express any view that Petitioner's GBS had "waxed and waned," but instead had "significantly improved," although with some residual effects – specifically referencing paresthesia and numbness in his feet, erectile dysfunction, and depression. Ex. 9 at 17.[11]

That neurology evaluation prompted another course of 12 outpatient PT sessions centered on Petitioner's post-GBS lower extremity weakness, instability, dizziness, and easy fatigability. He was encouraged to walk consistently, but not too much (e.g., 1 – 2 miles per day). Petitioner also obtained a left ankle brace at his therapist's recommendation. Ex. 11 at 304 – 11, 294 – 95, 282 – 84, 268 – 71, 251 – 53, 237 – 39, 225 – 227, 212 – 14, 182 – 84, 138 – 40, 87 – 90, 30 – 33 (organized chronologically). Petitioner also attended 6 OT sessions to improve upper extremity weakness, pain, and impaired sensation. *Id.* at 195 – 98, 171 – 72, 151 – 52, 113 – 14, 72 – 74, 5 – 6 (organized

---

[10] In January 2021, Petitioner was homebound due to "difficulty transferring, ambulation difficulties [and…] risk for infection" during the COVID-19 Pandemic. Ex. 4 at 88.

[11] Respondent also notes that during the first treatment gap, on July 1, 2021, while Petitioner was riding a bike, "his foot got caught" and he "flipped over," resulting in a right great toe proximal phalanx fracture. Ex. 10 at 29, 31. The records do not specifically reflect that Petitioner's GBS symptoms caused the fall. However, by October 2022, the treating orthopedist assessed that the fracture had healed, "his ongoing symptoms in the foot do not seem linked… This may be neurogenic pain." *Id.* at 14.

chronologically). After four months (April 11 – August 22, 2022), Petitioner had partially achieved his goals and was approaching independence with a home exercise program for these symptoms. Ex. 11 at 5, 30; *see also* Ex. 14 at 11 (primary care record noting that Petitioner was not using a cane anymore). He discontinued his formal therapies due to worsening pain in his neck and arms. *see also* Ex. 14 at 25 (July 2022 neurology record).

The second GBS treatment gap runs from his August 2022 PT and OT discharges to his April 2023 neurology reevaluation, While this gap is somewhat lengthy, the records do not describe any fluctuation in his GBS residuals. And he was still on Medicaid, Ex. 18 at 3. Overall, I find preponderant evidence that Petitioner's November 2020 GBS caused residual numbness, tingling, and weakness in his legs and feet; instability; fatigue; erectile dysfunction; and depression – which all continued for at least three years. Throughout this period, he fell periodically (but was fortunate to avoid any major injuries) and was significantly assisted by his life partner, for example, leaning on her arm during walks. *See, e.g.*, Ex. 11 at 30 – 33; Ex. 14 at 24 – 29, 30 – 37.

The medical record evidence also supports that Petitioner's GBS *partially* explains his chronic pain. His pre-vaccination medical records reflect that he was 56 years old at vaccination; recovering well from a right hip replacement; and denied any other problems notwithstanding an assessment of lumbar spine degenerative disc disease. *See, e.g.*, Ex. 2 at 48 – 51, Ex. 7 at 27 – 28. But his GBS onset included severe pain in his legs and back, and a January 2021 MRI visualized new "thickening and enhancement of the cauda equina nerve roots, consistent with the reported history of Guillain-Barré syndrome." Ex. 6 at 19.

Over two years into the course, MGH neurologists affirmed that Petitioner's lower body pain was "likely multifactorial with contribution from degenerative disc disease/stenosis, radiculopathy, and residual peripheral neuropathy." Ex. 14 at 24. Similarly, MGH chronic pain specialists assessed that this pain could be partially explained by "polyneuropathy from GBS… gait disturbance, deconditioning, possible core muscle weakness." Ex. 14 at 30; *accord* Ex. 19 at 14. To treat this pain, Petitioner consistently used various pain medications, including gabapentin, amitriptyline, acetaminophen, and capsaicin cream. In 2023, he attended a functional restoration program involving social work, OT, and PT evaluations. Ex. 14 at 39 – 52; Ex. 19 at 1 – 9. He also underwent a diagnostic medial branch block ("MBB")[12] in August 2023,

---

[12] An MBB "diagnose[s] the cause of your pain… If [MBBs] produce temporary relief, then radiofrequency treatments may be used to produce longer-term relief." Massachusetts General Hospital Pain Management Center – Patient Resources, *Medial Branch Blocks (Blocks of the Nerves to the Facet Joints)*, available at

followed by radiofrequency ablation ("RFA") of L3, L4, and L5 in December 2023. Ex. 14 at 53 – 58; Ex. 19 at 10 – 18.[13] Based on the treating providers' statements in this case, I find that Petitioner's GBS was at least a substantial factor explaining his long-term pain and suffering, his decision not to return to work in construction and carpentry, and hobbies including mountain biking, hiking, and fishing.[14]

For the foregoing reasons, Respondent has not justified his proffer of $131,500.00, or any figure below the $170,000.00 - $180,000.00 range as awarded in the cited cases (*Enstrom*, *Elenteny*, *Johnson*, *Fedewa*, *McCray*, and *Kresl)* simply because of Mr. Fiumara's treatment gaps and comorbidities (which were if anything, exacerbated by his persistent GBS sequelae, according to his treaters). This record also reflects a lengthier inpatient stay, outpatient therapy course, and overall duration of injury.

**I therefore find that a fair and appropriate award for pain and suffering in this case is $197,50.00.**[15] Although this award falls on the high end of the spectrum for GBS pain and suffering, it is based on the case-specific evidence - particularly the highly qualified treating physicians' opinions that Mr. Fiumara's long-term pain was multifactorial, but nonetheless partially explained by his GBS. Not every case contains such strong evidence. *Compare*, e.g., *O'Donnell v. Sec'y of Health & Hum. Servs*., No. 21-1508V, 2023 WL 9060699, *4 – 5 (Fed. Cl. Spec. Mstr. Nov. 20, 2023) (finding a "lack of clarity" about Petitioner's preexisting conditions and her recovery post-GBS); *Clemens v. Sec'y of Health & Hum. Servs*., No. 19-1547V, 2022 WL 2288515, at *7 (Fed. Cl. Spec. Mstr. May 17, 2022) (concluding that the petitioner's long-term complaints were not related to her prior GBS, rather, to her subsequent unrelated diagnoses of chronic fatigue syndrome, restless leg syndrome, and fibromyalgia).

---

https://www.massgeneral.org/anesthesia/pain-management-center/patient-resources (last accessed Sept. 30, 2024).

[13] "If successful, the effects of [RFA] can last from 3 to 18 months." Massachusetts General Hospital Pain Management Center – Patient Resources, *Radiofrequency Treatment*, available at https://www.massgeneral.org/anesthesia/pain-management-center/patient-resources (last accessed Sept. 30, 2024).

[14] However, the pre-vaccination medical records reflect that Petitioner was already been out of work due to the Pandemic and osteoarthritis in his right hip (prior to its replacement in August 2020). And the evidence does not support a conclusion that GBS explains Petitioner's persistent pain in his arms, shoulders, and neck; headaches; or left hip osteoarthritis.

[15] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

At the same time, however, the evidence of pain and suffering must suggest a particularly catastrophic and unusual injury if the cap is to be the proper sum – and here, despite Petitioner's demonstrated suffering and clear entitlement to a significant pain and suffering award, I do not find the evidence supports $250,000.00.

## Conclusion

Based on the record as a whole and arguments of the parties, **I award the following:**

**A. A lump sum payment of $197,500.00 (for past pain and suffering) in the form of a check payable to Petitioner;**

**B. A lump sum payment of $7,641.88, representing compensation for the satisfaction of the Commonwealth of Massachusetts lien, in the form of a check payable jointly to Petitioner and:**

**Commonwealth of MA
Casualty Recovery
P.O. Box 417811
Boston, MA 02241-7811**

**Petitioner shall endorse the check to the Commonwealth of Massachusetts.**

**C. A lump sum payment of $5,580.80, representing compensation for the satisfaction of the Mass General Brigham lien, in the form of a check payable jointly to Petitioner and:**

**Mass General Brigham Health Plan
399 Revolution Drive
Somerville, MA 02145**

**Petitioner shall endorse the check to Mass General Brigham Health Plan.**

These amounts represent compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[16]

---

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
